**LEXINGTON–FAYETTE URBAN COUNTY DETENTION CENTER, Harold Buchignani, Director and Ray Sabbatine, Assistant Director, Appellants,**

v.

**Thomas CROCKETT, George Ludlow, Jake Devare, Willie Johnson, Hugh Estill, Peter A. Davy, John Young, Jr., Michael Ray Johnson, Pleaz Frye, Jeff Elam, Chester G. Harris, Henry Levance, Isaiah Warren, Alex R. Hobbs, and George Wilson (Secretary of Kentucky Corrections Cabinet), Appellees.**

No. 89–SC–75–DG.

Supreme Court of Kentucky.

Feb. 8, 1990.

Rehearing Denied April 26, 1990.

Edward W. Gardner, Lexington, for appellants.

Mark A. Posnansky, C. McGehee Isaacs, Dept. of Public Advocate, Louisville, for appellees.

Barbara W. Jones, Corrections Cabinet, Office of General Counsel, Frankfort, for George Wilson.

LEIBSON, Justice.

This appeal is from two separate orders entered by Judge N. Mitchell Meade of Fayette Circuit Court addressing problems created by the overcrowded conditions in the Fayette County Detention Center.

The first order, dated June 16, 1987, mandated that the "Fayette County Detention Center and the Kentucky Corrections Cabinet shall, within thirty days ... decrease the population of the Fayette County Detention Center by fifty-six inmates from the population level incarcerated at the time the Court toured said facility [May 29, 1987] to a maximum population level of five hundred inmates." This order further directed the Detention Center to undertake to improve the plumbing system of the facility to provide adequate water pressure and hot water, likewise within thirty days.

The second order, dated July 2, 1987, followed a motion for modification filed on behalf of the Detention Center, and a hearing at which the Detention Center was permitted to introduce additional evidence. This supplemental order denied the motion for modification, and then extended the mandate against the Detention Center in the first order to specify that it shall "not accept any further federal prisoners until such time as the detention facility is able to comply with this Court's order fixing a cap ['five hundred inmates'] on the number of prisoners that can be incarcerated therein."

The appellants, Fayette Urban County Detention Center, its Director and Assistant Director, (hereinafter referred to, collectively, as the "Detention Center") appealed to the Court of Appeals, which affirmed. We have accepted discretionary review, and, for the reasons that follow, we reverse in part and remand for further proceedings consistent with this opinion.

At the outset we note that the orders presently appealed were entered while another case involving the overcrowded jail in Fayette County was on appeal. The prior case was an appeal from the decision made in another Division of Fayette Circuit Court, Judge James E. Keller, presiding, entered March 13, 1986, in which he held the Kentucky Corrections Cabinet in contempt of his previous order directing "the Cabinet to accept custody [of convicted felons] upon thirty days' notification." That order, and the fines assessed by Judge Keller for its violation, were affirmed in a case reported as *Campbell Cty v. Ky. Corrections Cabinet*, Ky., 762 S.W.2d 6 (1989), which was rendered September 8, 1988, rehearing denied January 19, 1989. The decision affirming Judge Keller was part of a decision on consolidated appeals of three cases from different counties, all involving the right of the Corrections Cabinet to refuse transfer from local jail facilities to state penal facilities of persons convicted of felonies and sentenced to imprisonment, as required by the Kentucky Constitution, Sections 253, 254, and KRS 532.100. The final decision in the *Campbell Cty.* case is controlling authority on a number of the issues presently before our court. Unfortunately, that case was still under appellate review when Judge Meade decided the present case and was not available to him to consider in rendering his decision.

Further, at the outset, we note that the Kentucky Corrections Cabinet has not appealed Judge Meade's order against it in the present case. Therefore, the judgment is final as to the Corrections Cabinet with the caveat that those points covered by our decision in the *Campbell Cty.* case must be followed in applying Judge Meade's directive to "decrease the population" of the confinement facility. Specifically, the Correction Cabinet's available options do not include releasing convicted prisoners. As we stated in the *Campbell Cty.* case:

"Contempt proceedings, not release of prisoners, is the appropriate remedy if such an order is disobeyed." *Id.* at 16.[1]

---

1. On remand of this case, if it should appear, as the Detention Center argues, that the contempt

The Detention Center does not contest the trial court's decision that five hundred inmates is the maximum population level appropriate in the detention facility. The appellants concede, at least by implication, that the appellees, who represent prisoners of all classes presently incarcerated in the jail, are entitled to relief by court order from overcrowded conditions when the jail population exceeds this cap. The primary contention on behalf of the Detention Center is that the overcrowded condition is caused solely by the backup of state prisoners awaiting transfer to state control, transfers which the Corrections Cabinet has refused pursuant to its "controlled intake policy," which was discussed at length in the *Campbell Cty.* case. *See* 762 S.W.2d at 7, *et seq.* This is "an internal policy to control the intake of prisoners into state custody," which we have held in violation of the Kentucky Constitution and state statutory law insofar as it unreasonably delays the transfer of convicted felons, who are perforce state prisoners, to state facilities. *Campbell Cty., supra.* We stated the state "cannot, by statute or executive regulations, directly or indirectly, impose that constitutional responsibility ['to house and care for state prisoners'] on the counties nor compel the counties to bear the expense attendant to such responsibility." 762 S.W.2d at 15.

We then stated that the "point" at which "it becomes clearly unreasonable to refuse to accept convicted felons into the state system ... is a factual question which addresses itself first to the fact-finding of the circuit court where the litigation is pending." Judge Keller's order, affirmed in the *Campbell Cty.* case, decided that thirty days was a reasonable time.

The Detention Center's argument has two prongs: (1) there is no evidence in the record to support a finding that the Lexington–Fayette Urban County Government in general, and the Detention Center in particular, did anything to cause the overcrowding problem that the trial court seeks to remedy by its order; and (2) that the effect of the portion of the order shifting part of the burden to relieve the overcrowding problem on the Detention Center, and through it on Urban County Government, is to diffuse responsibility for reducing the prison population so that it will be impossible to fix blame for failure to comply.

In support of this argument, Detention Center points to the uncontradicted evidence that at the time of Judge Meade's first hearing, on June 5, 1987, there were 570 persons housed in the Detention Center, 65 of whom were ready for transfer to state institutions, and 38 of whom were waiting in violation of Judge Keller's Fayette Circuit Court order requiring removal by the Corrections Cabinet within thirty days. On June 29, 1987, the week of the July 2 hearing, the inmate population was only 529, but 71 were ready for transfer to state institutions with 47 of these prisoners backed up in violation of Judge Keller's previous order. The statistics presented to us at oral argument, some two and a half years later, although not technically a matter appropriate for our consideration because obviously not part of the record, show that the same pattern continues, i.e., an impermissible number of prisoners, but only if those who are state prisoners and the undischarged responsibility of the Corrections Cabinet are included in the number.

█ As we have stated, the Corrections Cabinet has not challenged this evidence that overcrowding would not exist but for the controlled intake policy and the state's

---

fines levied pursuant to Judge Keller's order are not adequate to cover the costs to the local facility resulting from the failure by the state agency to comply with the court's order, the trial court then has the option to increase fines as necessary and appropriate to prevent the

continued disregard of the court's order from being cost efficient to the Corrections Cabinet. But prisoners cannot be released by court order in any proceedings except one where the judgment imposing the sentence is before the court for review according to law.

refusal to permit transfer of state prisoners to state facilities within a reasonable time. The Detention Center's appeal is not challenged except by the inmates who are plaintiffs below, and who argue that County Government must bear "some responsibility" for solving the overcrowding problem regardless of who is responsible for causing it. Everyone concedes that there is no practical way for the jailer to reduce the prison population on his own, because he has no authority to reduce the number of prisoners except by court order. Essentially, as regards County Government, the inmates' position is no more than a lobbying ploy to put pressure on County Government to negotiate with judges to find suitable alternatives to incarceration in the Detention Center, presumably such things as home incarceration, halfway houses, probation, or other less restrictive forms of punishment. The only other alternative for County Government would be to accept the burden of providing and maintaining additional space to house prisoners when the problem only exists because the state has not discharged its responsibility to care for state prisoners. As we stated in *Campbell Cty.*:

> "We cannot transfer the duties imposed upon state government to county government by legislation, by regulation, or by judicial action, even if such change would be beneficial." 762 S.W.2d at 9.

Thus, we agree with the Detention Center's position that Judge Meade's order errs in placing a joint responsibility on county and state government to relieve the overcrowding problem. The record does not support placing a burden on County Government to deal with the overcrowding problem by reducing the number of prisoners unless there are still too many prisoners after state government has discharged its responsibility by accepting transfer of state prisoners within a reasonable time.

The inmates/appellees further argue, and the Detention Center concedes, that it is the duty of the Detention Center to deal with abominable, intolerable conditions within the jail facility, and the Detention Center is not relieved of this responsibility because the state has overburdened the jail with state prisoners even though this overcrowding may be a primary cause of these conditions. The Detention Center, and County Government, must do all within its power to provide what is at least a minimum, tolerable level for conditions within the facility, such as the sanitation conditions addressed by Judge Meade's order "to undertake to improve the plumbing system," except it cannot be held responsible for what is physically impossible because of overcrowding caused by the state.

■ The question of what it is reasonably possible for County Government to do, and what it is not, brings us to Judge Meade's supplemental order of July 2, directing the Detention Center "not to accept any further federal prisoners until" the court order "fixing a cap" has been complied with. While we understand why County Government complains because it is being paid an amount suitable to cover the expense of housing and caring for the federal prisoners, nevertheless, so long as there are too many prisoners in the jail and the County bears responsibility for "conditions" within the jail facility, the trial court's order regarding the housing of federal prisoners is not arbitrary or unreasonable. It is a partial solution to the problems regarding intolerable conditions within the facility.

Entering into an agreement to house federal prisoners pursuant to the "Interlocal Cooperation Act," KRS 65.210, et seq., and KRS 441.025, is a power, not a duty, imposed upon County Government. KRS 441.025(4) states:

> "Any county may enter into an agreement pursuant to KRS 65.210 to 65.300 to provide or to use jail facilities."

While it is readily understandable why for financial reasons County Government should be permitted to make the best use possible of vacant, available jail space, this permissive use is necessarily secondary to

the duties and responsibilities imposed by KRS 441.025 and 441.045 to "provide for the incarceration of prisoners," including "rules for the government and cleanliness of the county jail and the comfort and treatment of prisoners." Here, the fact that the state has failed in its responsibility for taking care of state prisoners may explain, in whole or in part, the emergency situation Judge Meade was asked to address, but it does not relieve the situation. While Judge Meade's order cannot go beyond the solutions which the law provides, an order to the County to do all that is reasonably possible to relieve intolerable sanitary conditions, even at the expense of losing the revenue provided by housing federal prisoners, did not go beyond the solutions available to him under the law.

All Judge Meade's order of July 2 has done is to give priority to the County's duty to address conditions within the jail over its power to rent jail space to federal government. It is an order reasonably calculated to assist in the improvement of conditions within the jail by reducing the number of prisoners using the facility. In point of fact, all prisoners within the jail facility contribute to the problems resulting from overcrowding, not just state prisoners for whom transfer to state facilities has been unreasonably refused. While the trial court had no authority to order the County to release prisoners or to order the County to build additional spaces until the proof established that the number it is providing is inadequate to carry out the duties imposed upon the County by law, this same logic does not apply to spaces it has the power but not the duty to rent to federal agencies. Here, the trial court's decision to give priority to the duty imposed upon the County to meet a minimum acceptable level for conditions within the jail facility over the desire of County Government and the Detention Center to improve its balance sheet by renting to a federal agency is neither arbitrary or unreasonable. The record supports the trial judge's decision in this respect, and we affirm it.

Finally, the Detention Center argues the trial court erred by failing to allow it to present further evidence relating to the acceptance of federal prisoners, including the financial implications of acceptance of those prisoners. As the Court of Appeals correctly pointed out in its opinion, this issue is not properly preserved for review. The Detention Center's motion to vacate the trial court's order of July 2 did not ask to reopen the proceedings or present any additional testimony regarding federal prisoners. Although the Detention Center asserts surprise at the trial court's July 2 order, some evidence regarding this aspect of the problem was before the trial court at the time of its ruling, and in any event this aspect of the problem is largely, if not entirely, a matter of law. The situation would be the same and the trial court's ruling equally appropriate to prevent overcrowding if the numbers involved exceeded the legally acceptable population cap and no federal prisoners were as yet housed in the Detention Center, simply as a prophylactic measure to prevent further worsening of already intolerable conditions within the jail.

Thus, the trial court's order of July 2, 1987, and the decision of the Court of Appeals affirming that order, are affirmed. So much of the order of the trial court of June 17, 1987 as orders the Detention Center to act jointly with the Kentucky Corrections Cabinet in reducing the inmate population of the jail facility, and the Court of Appeals decision affirming same, are reversed, with directions to the trial court to take no such action against the Detention Center and County Government until the Kentucky Corrections Cabinet shall have discharged its responsibility and the inmate population shall still exceed the legally determined population cap. The within case is remanded to the trial court for further proceedings as necessary consistent with this opinion.

GANT, LAMBERT, LEIBSON, VANCE and WINTERSHEIMER, JJ., concur.

STEPHENS, C.J., dissents.

COMBS, J., not sitting.